459 Mass. 603 (2011)                                          603

Doe, Sex Offender Registry Board No. 10800 *v.* Sex Offender Registry Board.

John Doe, Sex Offender Registry Board No. 10800,
& another[1] *vs.* Sex Offender Registry Board & others.[2]

Suffolk. January 3, 2011. - May 3, 2011.

Present: Ireland, C.J., Spina, Cordy, Botsford, & Gants, JJ.

*Sex Offender. Sex Offender Registration and Community Notification Act.
Constitutional Law,* Sex offender, Taxation, Ex post facto law. *Due Process
of Law,* Sex offender, Taxation. *Evidence,* Sexual conduct, Hearsay, Medi-
cal record, Privileged record. *Practice, Civil,* Sex offender, Hearsay. *Notice,*
Administrative hearing. *Statute,* Validity. *Deoxyribonucleic Acid. Practice,
Criminal,* Probation. *Administrative Law,* Hearing.

This court concluded that the annual exaction assessed by the Sex Offender
Registry Board (board) upon every sex offender, pursuant to G. L. c. 6,
§ 178Q, was a valid regulatory fee rather than a tax, in that the Legislature
designated the exaction as a fee; the exaction is charged in exchange for
the governmental service of protection of the vulnerable members of the
Commonwealth's communities, and the regulatory scheme provides a sex
offender an opportunity to alter his classification level or terminate his
registration obligation; and the exaction was reasonably designed to
compensate the board for its anticipated regulatory expenses, rather than to
be a general source of revenue for the Commonwealth. [608-615]

This court concluded that the one-time exaction assessed by the director of the
State police crime laboratory on a sex offender for the collection of a
sample of the sex offender's deoxyribonucleic acid (DNA), pursuant to
G. L. c. 22E, § 3, was a valid regulatory fee, in that the exaction is charged
in exchange for the provision of a governmental service to a group of
individuals whose actions necessitated that service and who should bear
the burden of paying for it, i.e., the deterrence and discovery of crimes and
recidivistic criminal activity, the identification of individuals for and exclu-
sion of individuals from criminal investigation or prosecution, and the
search for missing persons; and in that the exaction is designed to offset
costs associated with creating, maintaining, and administering the State's
DNA database. [615-616]

An increase in the monthly probation supervision fee assessed upon a
probationer by the Commissioner of Probation pursuant to G. L. c. 276,
§ 87A, and the imposition, after the probationer's having been placed on
probation of a monthly probationers' victim services surcharge, did not
constitute an enhancement of the probationer's punishment in violation of

[1]John Doe, Sex Offender Registry Board No. 22142.
[2]The Commissioner of Probation and the director of the State police crime
laboratory.

the ex post facto clauses of the Federal and State Constitutions, where the monthly fees bore strong indicia that the Legislature intended them to be civil assessments rather than punitive sanctions, and where neither the purpose nor the effect of the statutory scheme was to increase retroactively the punishment for the probationer's crime [616-621]; further, the amendment by the Legislature of the statute, increasing the amount of the monthly fees, did not modify the judgment entered against the probationer in violation of art. 30 of the Massachusetts Declaration of Rights [621-622].

A hearing officer of the Sex Offender Registry Board (board), in denying a request by a sex offender (plaintiff) that a documentary film crew be permitted to videotape the plaintiff's classification hearing before the board, did not violate his rights under the First Amendment to the United States Constitution and art. 16 of the Massachusetts Declaration of Rights, where the plaintiff had no standing to assert the rights of the documentary film crew [622-624]; further, the fact that the classification hearing was not open to the public did not violate the plaintiff's right to due process, in that the hearing was an adjudicative administrative proceeding rather than a criminal or civil trial, and the board expressly determined that such a hearing should not be open to the public [624-627].

This court concluded that it was without jurisdiction to decide the constitutionality of the classification scheme used by the Sex Offender Registry Board (board), where the board did not have the authority to determine the constitutionality of its own regulations and where the plaintiff sex offender failed to bring an original action for declaratory relief in the Superior Court. [627-631]

In a civil action challenging the classification of the plaintiff as a level three sex offender, substantial evidence supported the conclusion of the Sex Offender Registry Board (board), where a hearing examiner for the board thoroughly considered the factors relevant to risk of reoffense and degree of dangerousness, and found present four such factors; where the hearing officer also took into account evidence that would mitigate the plaintiff's risk to reoffend; and where the hearing officer was not obligated to accept the opinion of the expert witness testifying on the plaintiff's behalf, even in the absence of contrary expert testimony [632-637]; further, no error arose from the admission in evidence of certain hearsay testimony, where the testimony bore sufficient indicia of reliability to constitute admissible evidence, where the hearing examiner did not rely primarily on such testimony in his determination, and where substantial evidence existed, apart from the hearsay testimony, to support the classification [638-639]; moreover, there was no merit to the plaintiff's claim of inadequate notice of the factual and legal issues to be discussed at the administrative hearing [639-640]; finally, no error arose from the admission in evidence of certain records of the Massachusetts Treatment Center (treatment center), where, given that the plaintiff, upon commitment to the treatment center, refused to participate in sex offender treatment or to answer questions posed by evaluators during scheduled reviews, the challenged records did not constitute privileged patient-psychotherapist communications, and even if the hearing examiner erred in admitting reports that may have incorporated privileged information, the plaintiff failed to show how the alleged error prejudiced his substantive rights [640-644].

CIVIL ACTION commenced in the Superior Court Department on August 31, 2006.

Motions for judgment on the pleadings with respect to certain issues were heard by *Stephen E. Neel,* J., and a motion to dismiss the remaining issues was also heard by him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*John G. Swomley* for the plaintiffs.

*Randall E. Ravitz,* Assistant Attorney General, for Commissioner of Probation & another.

*David L. Chenail* for Sex Offender Registry Board.

*Ryan M. Schiff & Beth L. Eisenberg,* Committee for Public Counsel Services, for Committee for Public Counsel Services, amicus curiae, submitted a brief.

*Gary D. Buseck,* for Gay & Lesbian Advocates & Defenders, amicus curiae, submitted a brief.

SPINA, J. On August 2, 2006, a hearing examiner of the Sex Offender Registry Board (board) found that the plaintiff (Doe) posed a high risk of reoffense and a high degree of dangerousness, and ordered that he register as a level three sex offender. Doe sought judicial review of the decision by filing a six-count complaint in the Superior Court pursuant to G. L. c. 6, § 178M, and G. L. c. 30A, § 14.[3] Counts I through IV, presenting claims against the board, challenge the validity of the sex offender registry fee, the lack of public access to a classification hearing, the validity of the classification scheme based on enumerated "factors" set forth in 803 Code Mass. Regs. § 1.40 (2002), the sufficiency of the evidence, the allowance of alleged hearsay evidence, the adequacy of the hearing notice, and the admission

---

[3]The complaint filed in the Superior Court by the plaintiff (Doe) was for judicial review of the determination of the Sex Offender Registry Board (board) as to *his* final classification and registration requirements. Nonetheless, a second plaintiff, John Doe, Sex Offender Registry Board No. 22142, appears on the complaint. He was classified by the board as a level two sex offender on May 25, 2004. There is no evidence in the record before us that John Doe, Sex Offender Registry Board No. 22142, filed a timely action for judicial review with respect to this determination. See G. L. c. 30A, § 14 (1) (person aggrieved by final agency decision has thirty days to file action for judicial review). Accordingly, we do not consider the propriety of his classification or any claims that he now attempts to raise in Doe's complaint.

of purportedly privileged treatment records. Counts V and VI, presenting claims against the director of the State police crime laboratory (director) and the Commissioner of Probation (commissioner), respectively, challenge the validity of the deoxyribonucleic acid (DNA) collection assessment and a statutory increase in the probation fees. As to Counts I through IV, Doe and the board filed cross motions for judgment on the pleadings. A judge in the Superior Court denied Doe's motion and allowed the board's motion, affirming its classification decision. As to Counts V and VI, the director and the commissioner filed a motion to dismiss the claims against them, which the judge allowed. Doe appealed, and we transferred the case to this court on our own motion. For the reasons that follow, we now affirm.[4]

1. *Background.* We summarize the facts found by the hearing examiner after an evidentiary hearing held over four dates in May and June, 2006, supplemented by undisputed facts from the record. We reserve other details for our discussion of particular issues.

Between 1988 and 1998, when Doe was in his late thirties and forties, he sexually assaulted four teenage boys whom he knew. Doe became acquainted with his victims, who were from troubled families, when he hired them to do chores around his house and another property that he owned. The sexual assaults occurred on multiple occasions after extended periods of "grooming" each victim. During the time that these events were happening, Doe was an attorney licensed to practice law in Massachusetts.[5] On July 17, 2000, he pleaded guilty to five charges of rape of a child (no force) in violation of G. L. c. 265, § 23. On four of the charges, Doe was sentenced to concurrent terms of from three to four years in the State prison. On the fifth charge, he received a sentence of lifetime probation with numerous conditions, to be served concurrently with his committed sentences. Doe's period of incarceration lasted from July 31, 2000, until January 8, 2004, and, apart from two

---

[4]We acknowledge the amicus briefs filed in support of Doe by the Committee for Public Counsel Services, with respect to the issue of the sex offender registry fee, and the Gay & Lesbian Advocates & Defenders, with respect to the issue of the validity of the classification scheme.

[5]The hearing examiner found that Doe was later disbarred.

minor disciplinary reports, he was deemed to have made a successful adjustment to prison life.

On December 9, 2003, prior to Doe's scheduled release from State prison, the Commonwealth filed a petition for his civil commitment as a sexually dangerous person pursuant to G. L. c. 123A. Doe was temporarily committed to the Massachusetts Treatment Center (treatment center) for evaluation. Subsequently, two qualified examiners, Drs. William Hazelett and Frederick Kelso, concluded that he was a sexually dangerous person. Following a jury trial on July 19, 2004, Doe was so adjudicated and committed to the treatment center for an indeterminate period of from one day to life. During his stay, Doe refused to participate in the sex offender treatment program offered by the facility. Instead, he opted to receive individual treatment through the sex offender program run by the Justice Resource Institute for the Department of Correction.

After approximately one year, Doe filed a petition for examination and discharge from the treatment center pursuant to G. L. c. 123A, § 9. Two different qualified examiners, Drs. Barbara Quinones and Robert Joss, evaluated him and determined that he no longer was a sexually dangerous person; two experts retained by Doe, Drs. Frederick Berlin and Barbara Schwartz, reached the same conclusion. In contrast, the community access board voted unanimously that Doe remained a sexually dangerous person. In January, 2006, a jury found him no longer sexually dangerous, and he was released from confinement. Doe continued individual sex offender treatment with Dr. Robert Prentky of the Justice Resource Institute.

On February 28, 2006, the board notified Doe of his obligation to register as a level three sex offender pursuant to G. L. c. 6, § 178K (2) (c).[6] He then filed a request for an evidentiary hearing to challenge his duty to register and his classification. Doe testified at the hearing. In addition, Dr. Schwartz, a licensed clinical psychologist specializing in the assessment and

[6]General Laws c. 6, § 178K (2) (c), provides in pertinent part: "Where the board determines that the risk of reoffense is high and the degree of dangerousness posed to the public is such that a substantial public safety interest is served by active dissemination [of sex offender registry information], it shall give a level 3 designation to the sex offender."

608                                       459 Mass. 603 (2011)

Doe, Sex Offender Registry Board No. 10800 *v.* Sex Offender Registry Board.

treatment of sex offenders, testified as an expert witness on his behalf. Dr. Schwartz adopted and expanded on her earlier evaluation of Doe conducted pursuant to his G. L. c. 123A, § 9, petition. She challenged the scientific validity of the board's regulations for determining a sex offender's risk of reoffense and degree of dangerousness as set forth in 803 Code Mass. Regs. § 1.40, and she reaffirmed her opinion that Doe posed a low risk to reoffend. The hearing examiner also considered a variety of documentary evidence, including reports prepared by the qualified examiners with respect to Doe's § 9 petition, medical records submitted by Doe pertaining to his treatment for bladder cancer, and several journal articles about sex offender recidivism. He concluded that the board had proved by a preponderance of the evidence that Doe posed a high risk to reoffend and a high degree of dangerousness such that he should be classified as a level three offender.[7] We now turn to the issues raised in Doe's complaint for judicial review.

2. *Sex offender registry fee.* General Laws c. 6, § 178Q, provides that the board "shall assess upon every sex offender a sex offender registration fee of [seventy-five dollars]" (registry fee). Once it has been determined with finality that a sex offender must register with the board, the offender "shall pay said sex offender registry fee upon his initial registration as a sex offender and annually thereafter on the anniversary of said registration." *Id.* A sex offender's duty to pay the registry fee "shall only terminate upon the termination of said offender's duty to register as a sex offender as set forth in [G. L. c. 6, § 178G]." *Id.* The board may waive payment of the registry fee "if it determines that such payment would constitute an undue hardship on said person or his family due to limited income, employment status, or any other relevant factor." *Id.* The registry fee shall be collected by the board and "transmitted to the treasurer for deposit into the General Fund."[8] *Id.* Further, the

---

[7] The determination by a hearing examiner of a sex offender's duty to register and final classification level is the final decision of the board. See 803 Code Mass. Regs. § 1.23 (2004). "For purposes of judicial review, this decision shall be considered the final agency action." *Id.*

[8] Effective May 22, 2010, the Legislature amended G. L. c. 6, § 178Q, to provide that the sex offender registry fee "shall be collected and retained by the sex offender registry board." St. 2010, c. 112, § 3.

board "shall account for all such fees received and report said fees annually to the secretary of administration and finance and the house and senate committees on ways and means." *Id.*

In Count IV of his complaint, Doe challenges the validity of the registry fee assessed pursuant to § 178Q. He contends that it is not a lawful fee but, instead, is a disproportionate tax on sex offenders and, as such, does not pass constitutional muster. We conclude that the registry fee is a valid regulatory fee.[9]

When reviewing a statute to determine whether an exaction constitutes a fee or a tax, we accord deference to the Legislature's classification of the exaction. See *Emerson College* v. *Boston,* 391 Mass. 415, 424 (1984) (*Emerson College*), and cases cited (holding that monetary charge for augmented fire protection by city of Boston constituted tax to defray cost of public services, not fee for benefit of particular building owners). See also *German* v. *Commonwealth,* 410 Mass. 445, 448-449 (1991). Here, the Legislature has designated the exaction imposed on sex offenders as a "registry fee." G. L. c. 6, § 178Q. We view this classification with deference, recognizing that, ultimately, "the nature of a monetary exaction 'must be determined by its operation rather than its specially descriptive phrase.' " *Emerson College, supra,* quoting *Thomson Elec. Welding Co.* v. *Commonwealth,* 275 Mass. 426, 429 (1931). See P. Nichols, Taxation in Massachusetts 4 (3d ed. 1938) (declaration of Legislature as to nature of exaction "will be accepted as true, unless incompatible with the meaning and effect of the statute as a whole"). Doe, as the party challenging the exaction, has the burden of proving its invalidity. See *Nuclear Metals, Inc.* v. *Low-Level Radioactive Waste Mgt. Bd.,* 421 Mass. 196, 201 (1995).

The analytical factors for determining whether an exaction is a tax or a fee were enunciated in *Emerson College, supra* at 424-425, and subsequently refined in *Silva* v. *Attleboro,* 454

---

[9]General Laws c. 6, § 178Q, was inserted by St. 2003, c. 26, § 12, subsequent to Doe's guilty pleas on July 17, 2000, to five charges of rape of a child (no force). Contrary to the requests for relief set forth in his complaint, Doe asserted in his opposition to the board's motion for judgment on the pleadings that he had not presented claims against the board that the registry fee violates the ex post facto provisions or double jeopardy clauses of the Federal and State Constitutions. Accordingly, we need not consider these matters.

Mass. 165, 170-173 (2009) (*Silva*) (holding that monetary charge assessed by certain municipalities for issuance of burial permit was valid regulatory fee, not unlawful tax). Broadly speaking, a tax has been defined as "an enforced contribution to provide for the support of government." *Emerson College, supra* at 427, quoting *United States* v. *Tax Comm'n*, 421 U.S. 599, 606 (1975). See *Opinion of the Justices*, 393 Mass. 1209, 1216 (1984) (tax is "a revenue-raising exaction imposed through generally applicable rates to defray public expenses"). By comparison, "[f]ees imposed by a governmental entity tend to fall into one of two principal categories: user fees, based on the rights of the entity as proprietor of the instrumentalities used, . . . or regulatory fees (including licensing and inspection fees), founded on the police power to regulate particular businesses or activities." *Emerson College, supra* at 424, citing *Opinion of the Justices*, 250 Mass. 591, 597, 602 (1925). Fees tend to share common traits that distinguish them from taxes and provide the framework for our analysis.

First, unlike taxes, fees "are charged in exchange for a particular governmental service which benefits the party paying the fee in a manner 'not shared by other members of society.' " *Emerson College, supra*, quoting *National Cable Television Ass'n* v. *United States*, 415 U.S. 336, 341 (1974). In the context of regulatory fees, we stated in *Silva, supra* at 170, that "the particularized benefit provided in exchange for the [regulatory fee] is the existence of the regulatory scheme whose costs the fee serves to defray." Such fees "serve regulatory purposes either 'directly by, for example, deliberately discouraging particular conduct by making it more expensive,' or indirectly by defraying an agency's regulation-related expenses." *Id.* at 171, quoting *Nuclear Metals, Inc.* v. *Low-Level Radioactive Waste Mgt. Bd., supra* at 201-202. See P. Nichols, Taxation in Massachusetts, *supra* at 7-8 (pecuniary exaction designed to prevent persons within jurisdiction from conducting themselves to detriment of general welfare is imposed under police power rather than under power of taxation).

Here, an annual exaction of seventy-five dollars is charged to each sex offender once it has been determined that such offender must register with the board. We recognize that the purpose of the sex offender registry is "to protect forthwith the

vulnerable members of our communities from sexual offenders." St. 1999, c. 74, preamble. To that end, it is the Commonwealth's policy "to assist local law enforcement agencies' efforts to protect their communities by requiring sex offenders to register and to authorize the release of necessary and relevant information about certain sex offenders to the public." *Id.* at § 1. In the context of regulatory fees, we construe the term "benefit" broadly to encompass the provision of particular governmental services to a group of individuals whose actions have necessitated the regulatory scheme in the first instance and who should shoulder the burden of paying for such services. That this may not be viewed as a "benefit" to a sex offender in the traditional sense of the word does not detract from the fact that a governmental entity has provided a particularized "service" to individuals who require it.

We add that the regulatory scheme governing the registration of sex offenders is not wholly devoid of any benefit to a sex offender because it provides the offender with the opportunity to alter his classification level or terminate his registration obligation. Because the risk to reoffend and the degree of dangerousness posed by a sex offender may change over time, a level two or level three sex offender may file with the board, after three years from the date of his final classification, a motion for reexamination of his classification level. See 803 Code Mass. Regs. § 1.37C(1), (2)(a) (2004). Such motions shall be reviewed by the full board (comprised of at least four members, *id.* at § 1.03 [2004]), and if a motion is denied, the offender may submit a subsequent motion for reclassification three years after the date of the previous denial. See *id.* at § 1.37C(2)(c), (h). Similarly, pursuant to G. L. c. 6, § 178G, "[a] person required to register with the sex offender registry board may make an application to said board to terminate the obligation upon proof, by clear and convincing evidence, that the person has not committed a sex offense within ten years following conviction, adjudication or release from all custody or supervision, whichever is later, and is not likely to pose a danger to the safety of others." All such applications shall be reviewed by the full board, and if an application is denied, the offender may reapply for termination of his registration obligation three years after the date of

the denial. See 803 Code Mass. Regs. § 1.37B(1), (5) (2004). The imposition of a monetary exaction on sex offenders helps to defray the board's costs of operation, including acting on such motions and applications.

Second, we stated in *Emerson College* that fees, unlike taxes, "are paid by choice, in that the party paying the fee has the option of not utilizing the governmental service and thereby avoiding the charge." *Emerson College, supra* at 424-425, citing *Vanceburg* v. *FERC*, 571 F.2d 630, 644 n.48 (D.C. Cir. 1977), cert. denied, 439 U.S. 818 (1978). This court subsequently recognized in *Silva* that voluntariness is not an essential characteristic of all fees and, in particular, is not "relevant in the regulatory fee context." *Silva, supra* at 171-172. See *Nuclear Metals, Inc.* v. *Low-Level Radioactive Waste Mgt. Bd., supra* at 206 (in regulatory fee context, "element of choice is not a compelling consideration which can be used to invalidate an otherwise legitimate charge"). Therefore, the issue of voluntariness is not pertinent here to the determination whether the registry fee is a fee or a tax. See *Silva, supra* at 172 & n.9.

Finally, fees, unlike taxes, "are collected not to raise revenues but to compensate the governmental entity providing the services for its expenses." *Emerson College, supra* at 425. We have stated that the fact that fees are deposited into a general fund, instead of a fund for a designated purpose, carries weight in suggesting that an exaction is a tax, but is "not decisive." *Silva, supra* at 173, quoting *Emerson College, supra* at 427. The critical question is whether the fees are reasonably designed to compensate an entity for its anticipated regulatory expenses. See *Silva, supra*. See also *Southview Coop. Hous. Corp.* v. *Rent Control Bd. of Cambridge*, 396 Mass. 395, 404 (1985) (charges assessed by rent control board on landlords in connection with petitions for individual rent adjustments reasonably designed to compensate board for anticipated costs); *Baker* v. *Department of Envtl. Protection*, 39 Mass. App. Ct. 444, 446 (1995) ("an agency may charge fees that offset general agency expenses, as well as the specific costs of the service in relation to each person charged a fee"). In making this determination, "reasonable latitude must be given to the agency in fixing charges to cover its anticipated expenses in connection with the services to

be rendered." *Southview Coop. Hous. Corp.* v. *Rent Control Bd. of Cambridge, supra* at 403. Relevant expenses include both the direct and the indirect or incidental costs associated with the particular governmental service. See *id.* at 404 n.5; *Emerson College, supra* at 425 n.16.

Here, the fact that, prior to May 22, 2010, the board was required to collect the registry fee and transmit it "to the treasurer for deposit into the General Fund," G. L. c. 6, § 178Q, inserted by St. 2003, c. 26, § 12, is not a dispositive indicator that the exaction is a tax. See *Silva, supra* at 173. We agree with the judge below that the language in § 178Q requiring an accounting by the board of all registry fees received suggests that the Legislature intended for the board to monitor the revenue generated by such fees vis-à-vis the expenses incurred in operating the sex offender registry. The amount of the registry fee, incidental to a regulatory scheme established in the exercise of the Commonwealth's police powers and, as such, rationally thought to be commensurate with the scheme's reasonable expenses, does not compel us to conclude that it is intended chiefly for the production of revenue.[10] See *Opinion of the Justices*, 250 Mass. 591, 602 (1925). Moreover, the board has

[10]Legislative appropriations suggest that expenses associated with the sex offender registry exceed the revenue generated by the registry fee. For example, projected nontax revenue for the board for the 2006 fiscal year was $750,280, see St. 2005, c. 45, § 1B, while $3,597,380 was appropriated from the General Fund to the board for the operation of the sex offender registry program, see *id.* at § 2. Projected nontax revenue for the board for the 2007 fiscal year was $4,000, see St. 2006, c. 139, § 1B, while $3,972,913 was appropriated from the General Fund to the board for the operation of the sex offender registry program, with the provision that the registry fee be used to expand the victim services unit, see *id.* at § 2. Projected nontax revenue for the board for the 2008 fiscal year was $210,000, see St. 2007, c. 61, § 1B, while $3,921,069 was appropriated from the General Fund to the board for the operation of the sex offender registry program, with the provision that the registry fee be directed to the Massachusetts office for victim assistance, see *id.* at § 2. For the 2008 fiscal year, the board also received a supplemental appropriation of $354,976. See St. 2008, c. 62, § 2. Projected nontax revenue for the board for the 2009 fiscal year was $245,531, see St. 2008, c. 182, § 1A, while $4,928,494 was appropriated from the General Fund to the board for the operation of the sex offender registry program, with the provision that the registry fee be directed to the Massachusetts office for victim assistance, see *id.* at § 2. There was no projected nontax revenue specifically designated for the board for the 2010 fiscal year, see St. 2009, c. 27, § 1B, while $3,983,913 was appropriated from the General Fund to the board for the operation of the sex offender

614             459 Mass. 603 (2011)

Doe, Sex Offender Registry Board No. 10800 *v*. Sex Offender Registry Board.

the discretion to waive payment of the registry fee based on a showing of undue hardship. See G. L. c. 6, § 178Q. See also 803 Code Mass. Regs. § 1.28(2)(d) (2004) (board shall use indigency standards under G. L. c. 211D to determine whether payment of registry fee constitutes undue hardship on level one offender); 803 Code Mass. Regs. § 1.29(2)(d) (2004) (same for level two offender); 803 Code Mass. Regs. § 1.30(2)(d) (2004) (same for level three offender). All of these considerations lead us to conclude that the registry fee is reasonably designed to compensate the board for its anticipated regulatory expenses, and not to be a general source of revenue for the Commonwealth.

We find instructive the opinion of the Supreme Court of New Hampshire in *Horner* v. *The Governor*, 157 N.H. 400 (2008), in which the court considered a challenge to the imposition of a semiannual sex offender registration fee on every sex offender required to register with the New Hampshire division of State police, which maintained the sex offender registry. The court held that the fee imposed on sex offenders was not a mechanism for producing additional revenue for the State, but rather was intended "to support a governmental regulatory activity made necessary by the actions of those who are required to pay the charge." *Id.* at 403. Such regulatory services would be unnecessary were there no sex offenders. See *id.* Accordingly, the semiannual sex offender registration fee was properly characterized as a fee, not a tax.[11] See *id.* at 404.

registry program, with the provision that the registry fee be directed to the Massachusetts office for victim assistance, see *id.* at § 2. The registry fee was subsequently directed to the board. See St. 2009, c. 65, § 21. There was no projected nontax revenue specifically designated for the board for the 2011 fiscal year, see St. 2010, c. 131, § 1B, while $3,641,391 was appropriated from the General Fund to the board for the operation of the sex offender registry program, with the provision that the registry fee be retained and expended by the board, see *id.* at § 2.

[11]In *Horner* v. *The Governor*, 157 N.H. 400, 403 (2008), the plaintiff also argued that, to be considered a fee rather than a tax, the registration fee had to confer a particular benefit on the individual paying the fee, rather than on society as a whole. The court declined to consider this argument because the plaintiff offered no New Hampshire law in support of his position. See *id.* Although not articulating a particularized benefit analysis, the court's conclusion that the costs associated with maintaining a regulatory program were properly borne by those individuals whose actions necessitated the program is compelling and comports with our conclusion.

459 Mass. 603 (2011)                                                     615

Doe, Sex Offender Registry Board No. 10800 *v.* Sex Offender Registry Board.

Based on our consideration of the analytical factors for determining whether an exaction is a tax or a fee, together with the Legislature's classification of the monetary exaction here as a "registry fee," G. L. c. 6, § 178Q, we conclude that the registry fee assessed on every sex offender is a lawful fee, not a tax.

3. *DNA collection assessment.* Pursuant to G. L. c. 22E, § 3, "[a]ny person who is convicted of an offense that is punishable by imprisonment in the state prison . . . shall submit a DNA sample to the department [of State police] within 1 year of such conviction . . . or, if incarcerated, before release from custody, whichever occurs first." General Laws c. 22E, § 4 (*b*), provides that "[t]he cost of preparing, collecting and processing a DNA sample shall be assessed against the person required to submit a DNA sample, unless such person is indigent as defined in [G. L. c. 261, § 27A]." Further, "[t]he cost of preparing, collecting and processing a DNA sample shall be determined by the secretary for administration and finance in consultation with the director [of the State police crime laboratory] and shall be paid to the department [of State police] and retained by it to offset costs associated with creating, maintaining and administering the state DNA database." *Id.*

Doe alleges in Count V of his complaint that, subsequent to his release from prison, he was required to submit a DNA sample and was assessed $110 by the director of the State police crime laboratory for collection of the sample.[12] See 801 Code Mass. Regs. § 4.02(520) (2003) (setting fees for services provided by Department of State police). In Doe's view, DNA collection does not provide him with any particularized benefit. Accordingly, he contends that, like the sex offender registry fee, the DNA collection assessment is not a lawful fee but, instead, is a disproportionate tax on sex offenders and, as such, does not pass constitutional muster. We conclude that the DNA collection assessment is a valid regulatory fee.

We need not reiterate our prior discussion of the analytical factors for determining whether a statutory exaction is a tax or a fee. See *Silva, supra* at 170-173; *Emerson College, supra* at 424-425. Instead, we proceed directly to consideration of the

---

[12]Doe has not alleged that he ever sought to have the DNA collection assessment waived because of indigency.

nature of the DNA collection assessment. This one-time exaction of $110 is charged to all persons required to submit a DNA sample to the Department of State Police (unless indigent) as a consequence of having been "convicted of an offense that is punishable by imprisonment in the state prison." G. L. c. 22E, § 3. See G. L. c. 22E, § 4 (*b*). We recognize that it is a stated policy of the Commonwealth "to assist local, state and federal criminal justice and law enforcement agencies in: (1) deterring and discovering crimes and recidivistic criminal activity; (2) identifying individuals for, and excluding individuals from, criminal investigation or prosecution; and (3) searching for missing persons." St. 1997, c. 106, § 1 ("An Act relative to the enhancement of forensic technology"). To this end, the Legislature has found that "the collection and analysis of DNA samples is an integral part of the investigation and prosecution of criminal offenses and that such technology is an important tool in the defense of individuals charged with criminal offenses in the commonwealth." *Id.* at § 2. See *Landry* v. *Attorney Gen.*, 429 Mass. 336, 347 (1999), cert. denied, 528 U.S. 1073 (2000) (upholding statutory scheme and stating that DNA database intended to "preserv[e] a permanent identification record of convicted persons for resolving past and future crimes").

In our view, the DNA collection assessment is analogous to the sex offender registry fee. Although the requirement that certain offenders pay such an assessment may not be regarded as a "benefit," in the traditional sense of the word, to those who must submit a DNA sample, the Department of State Police nonetheless has provided a particularized "service" to a group of individuals whose actions have necessitated that service and who should bear the burden of paying for it. The DNA collection fee is a regulatory component of any sentence that involves incarceration in the State prison. Further, it is not designed to be a broad revenue-raising exaction for the Commonwealth but, rather, "to offset costs associated with creating, maintaining and administering the state DNA database." G. L. c. 22E, § 4 (*b*). The fee is retained by the Department of State Police for that specific purpose. See *id.* Accordingly, for these reasons, we conclude that the statutory exaction for DNA collection is a lawful fee, not a tax.

4. *Probation fees.* General Laws c. 276, § 87A, provides

that "[t]he court shall assess upon every person placed on supervised probation . . . a monthly probation supervision fee . . . in the amount of [sixty dollars] per month. Said person shall pay said probation fee once each month during such time as said person remains on supervised probation." The court may waive payment of the probation fee if "it determines after a hearing and upon written finding that such payment would constitute an undue hardship on said person or his family due to limited income, employment status or any other factor." *Id.* The probation fee "shall be collected by the several probation offices of the trial court and transmitted to the state treasurer for deposit into the General Fund." *Id.* A probationer also is required to pay "a monthly probationers' victim services surcharge . . . in the amount of [five dollars] per month," and, similarly, it may be waived on a showing of "undue hardship." *Id.*

When Doe was placed on lifetime probation on July 31, 2000, one of his conditions of probation was that he "pay the probation fee as determined by the Probation Department." At that time, the probation fee was fifty dollars. See G. L. c. 276, § 87A, as amended through St. 1999, c. 127, § 185. Doe alleges in Count VI of his complaint that since February, 2006, he has been required to pay probation fees of sixty-five dollars per month.[13] See St. 2003, c. 26, § 510 (increasing monthly probation fee from fifty to sixty dollars and adding victim services surcharge of five dollars). He contends that this increase in his probation fees constitutes an enhancement of his punishment, and, as such, violates the ex post facto clauses of the Federal and State Constitutions. We disagree.[14]

As pertinent to the circumstances of this case, the ex post

[13]Doe has not alleged that he ever sought to have the probation fees waived.

[14]In the memorandum in support of the motion to dismiss, the Commissioner of Probation (commissioner) asserted, among other things, that because he was acting as a "quasi judicial" officer in collecting the statutorily authorized probation fees, he was entitled to absolute immunity from Doe's claims. See *LaLonde* v. *Eissner*, 405 Mass. 207, 210-211 (1989). The motion judge agreed, concluding that in light of the plain language of G. L. c. 276, § 87A, the commissioner, by collecting the probation fees, was acting "at a judge's discretion" and performing "essential judicial functions" such that he was entitled to absolute immunity. There appears to be merit to this conclusion. Nevertheless, Doe's real complaint is with the increase in the probation fees, rather than with the commissioner's authority to collect them. We consider the issue

facto clauses of the Federal and State Constitutions prohibit laws that retroactively increase the "punishment" for criminal acts. See *Commonwealth* v. *Bargeron*, 402 Mass. 589, 590 (1988), quoting *Calder* v. *Bull*, 3 U.S. (3 Dall.) 386, 390 (1798) (ex post facto law is one that "changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed").[15] "This prohibition, however, applies only to statutes that are punitive in nature; civil remedies are not subject to the prohibition against ex post facto laws." *Gordon* v. *Registry of Motor Vehicles*, 75 Mass. App. Ct. 47, 50 (2009), citing *Commonwealth* v. *Fourteen Thousand Two Hundred Dollars*, 421 Mass. 1, 6 (1995). To prevail on his ex post facto claim, Doe "must show both that the law he challenges operates retroactively (that it applies to conduct completed before its enactment) and that it raises the penalty from whatever the law provided when he acted." *Commonwealth* v. *Cory*, 454 Mass. 559, 564 (2009) *(Cory)*, quoting *Johnson* v. *United States*, 529 U.S. 694, 699 (2000).

The crime for which Doe was placed on lifetime probation in 2000 was committed in 1998, *after* the enactment of G. L. c. 276, § 87A, in 1984, although the statute at that time did not provide for the assessment of a probation fee. See St. 1984, c. 294, § 1. The requirement that a probationer pay a "monthly probation day supervision fee" that would be "equal to not less than one day's net wages nor more than three days' net wages" was added in 1988. See St. 1988, c. 202, § 27. The monthly probation fee was designated as a specific dollar amount (thirty dollars) in 1990. See St. 1990, c. 150, § 343. The amount was

of the increase in fees to be one of public importance, it has been fully briefed, and it is likely to arise again. Accordingly, we pass on the issue of immunity and consider the underlying merits of Doe's claims. See, e.g., *Commonwealth* v. *Kaupp*, 453 Mass. 102, 114 (2009); *Allen* v. *Boston Redev. Auth.*, 450 Mass. 242, 254 n.20 (2007).

[15] Article I, § 10, of the United States Constitution provides: "No state shall . . . pass any . . . ex post facto law." Article 24 of the Massachusetts Declaration of Rights states: "Laws made to punish for actions done before the existence of such laws, and which have not been declared crimes by preceding laws, are unjust, oppressive, and inconsistent with the fundamental principles of a free government." We have interpreted the meaning and scope of the ex post facto clauses of the Federal and State Constitutions identically. See *Dutil, petitioner*, 437 Mass. 9, 19 n.8 (2002); *Commonwealth* v. *Bruno*, 432 Mass. 489, 492 n.4 (2000).

increased to fifty dollars in 1999, see St. 1999, c. 127, § 185, and the probation fees about which Doe now complains (totaling sixty-five dollars per month) were enacted in 2003. See St. 2003, c. 26, § 510. Arguably, the portion of G. L. c. 276, § 87A, that imposes fees of sixty dollars on probationers has a retrospective application to Doe because it was enacted after the commission of his crime. We, therefore, consider whether § 87A is punitive in nature.

This analysis involves a two-part inquiry. "First, we must try to discern whether the Legislature explicitly or implicitly intended to denominate the statute a civil remedy or criminal penalty." *Cory, supra* at 565. See *Commonwealth* v. *Bruno*, 432 Mass. 489, 500 (2000) ("Whether a statute was intended to be criminal or civil depends on the Legislature's intent, which is a matter of statutory construction"). If the Legislature intended that a statute be deemed penal, then further inquiry is unnecessary. See *Cory, supra.* "If, however, the Legislature evinced an intent that the statute be civil, the second part of the inquiry comes into play: is the statutory scheme 'so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.' " *Id.*, quoting *Smith* v. *Doe*, 538 U.S. 84, 92 (2003). Doe, as the party challenging the statute, "carries a very heavy burden to show that the statute is punitive in one of these ways." *Cory, supra.*

As to the first part of the inquiry, Doe relies on the fact that G. L. c. 276, § 87A, is located in the portion of the General Laws that pertains to "Crimes, Punishments and Proceedings in Criminal Cases" to support his contention that the Legislature intended for the statute to be punitive. We conclude that this is not sufficient. See *Cory, supra* at 565-566 (describing factors of text and structure that help to categorize statute). The fees under § 87A are a component of probation, the primary goals of which are rehabilitation of a defendant and protection of the public; the fees themselves suggest more of a civil than a criminal orientation. See *Commonwealth* v. *Goodwin*, 458 Mass. 11, 15 (2010); *Cory, supra* at 567. The language of § 87A provides that the fees are for "monthly probation supervision" and "victim services," indicating a regulatory purpose. Significantly, the language of § 87A also provides that the probation fees may be waived by the court on a showing that their payment would

constitute an undue hardship, further suggesting that the fees are not intended to be a criminal penalty. See *id.* The probation fees bear strong indicia of being a civil assessment rather than a punitive sanction, a conclusion supported by the second half of our two-part inquiry.

In *Cory, supra* at 568, we set forth "useful guideposts" enunciated in *Kennedy* v. *Mendoza-Martinez,* 372 U.S. 144, 168-169 (1963) (*Mendoza-Martinez*), for determining whether a sanction is so punitive in purpose or effect as to negate its characterization as civil.[16] See *Smith* v. *Doe, supra* at 97. We need not discuss these guideposts in exhaustive detail because apart from the fact that G. L. c. 276, § 87A, applies to every person who has been placed on supervised probation for the commission of a crime, nothing regarding the purpose or effect of the probation fees suggests that they are punitive in nature. See *Powers* v. *Commonwealth,* 426 Mass. 534, 539 & n.9 (1998) (acknowledging but declining to address in detail each *Mendoza-Martinez* factor). To the contrary, it can fairly be said that the intent of § 87A is to defray the costs associated with the provision of services to probationers, as an alternative to imprisonment.[17] The fees are assessed on all persons placed on supervised probation, irrespective of the nature or severity of their offenses, suggesting a nonpunitive, regulatory purpose. Moreover, as we have mentioned, the probation fees may be waived by the court on a showing of undue hardship. See G. L. c. 276, § 87A. In our view, nothing about these fees suggests that they are designed to further the traditional aims of punishment, namely retribution and deterrence, particularly given their modest amounts. The fact that probation fees have increased from fifty to sixty-five dollars does

---

[16]The seven factors or "guideposts" set forth in *Kennedy* v. *Mendoza-Martinez,* 372 U.S. 144, 168-169 (1963), for evaluating the nature of a sanction are whether (1) it involves an affirmative disability or restraint; (2) it has historically been regarded as a punishment; (3) it comes into play only on a finding of scienter; (4) its operation will promote the traditional aims of punishment — retribution and deterrence; (5) the behavior to which it applies is already a crime; (6) an alternative purpose to which it may rationally be connected is assignable for it; and (7) it appears excessive in relation to the alternative purpose assigned.

[17]Doe has presented no evidence to suggest that the probation fees exceed the costs of services associated with the supervision of offenders released into the community.

not transform G. L. c. 276, § 87A, into a penal statute. This nominal increase over four years is merely a reflection of the increased costs of providing services necessitated by an individual's placement on probation. Neither the purpose nor the effect of G. L. c. 276, § 87A, is to increase retroactively the "punishment" for Doe's crime. Accordingly, we conclude that the statute does not violate the ex post facto clauses of the Federal or State Constitution.

Doe next contends that by increasing the amount of the probation fees in 2003 to sixty-five dollars, the Legislature modified the judgment entered against him on July 31, 2000, in violation of art. 30 of the Massachusetts Declaration of Rights. We disagree.

Article 30 provides, in relevant part: "In the government of this Commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them . . . ." We have stated that "[a]lthough art. 30, by its express terms, prohibits the Legislature from exercising 'judicial powers,' we have never interpreted the doctrine of separation of powers to require an absolute division of the legislative and judicial functions." *First Justice of the Bristol Div. of the Juvenile Court Dep't* v. *Clerk-Magistrate of the Bristol Div. of the Juvenile Court Dep't*, 438 Mass. 387, 396 (2003). To the contrary, some overlap is inevitable. See *Gray* v. *Commissioner of Revenue*, 422 Mass. 666, 671 (1996), and cases cited. What cannot be tolerated under art. 30 is the Legislature's interference with the core functions of the judiciary. See *First Justice of the Bristol Div. of the Juvenile Court Dep't* v. *Clerk-Magistrate of the Bristol Div. of the Juvenile Court Dep't, supra*; *Chief Admin. Justice of the Trial Court* v. *Labor Relations Comm'n*, 404 Mass. 53, 56 (1989). The Legislature impermissibly interferes with judicial functions when it purports to modify the judgment of a court. See *Gray* v. *Commissioner of Revenue, supra*; *Department of Revenue* v. *Jarvenpaa*, 404 Mass. 177, 183 (1989). See also *Opinion of the Justices*, 234 Mass. 612, 621-622 (1920) (judgment of court can be modified only by judicial process; Legislature cannot "supersede" judgment by declaration to that effect).

In criminal cases, the final judgment is the sentence. See

*State Bd. of Retirement* v. *Woodward*, 446 Mass. 698, 707 n.8 (2006); *Commonwealth* v. *Dascalakis*, 246 Mass. 12, 19 (1923). Here, Doe was placed on lifetime probation. In essence, that is the judgment that was entered against him. The Legislature's amendment of G. L. c. 276, § 87A, to increase the amount of the probation fees did not constitute a modification of such judgment. The specific amount of the fees is ancillary to the judgment.[18] The fact that the probation fees have increased from fifty to sixty-five dollars does not change Doe's placement on lifetime probation. Accordingly, we conclude that the Legislature has not violated art. 30 by increasing the amount of the probation fees in § 87A.[19]

5. *Public access to classification hearing.* Prior to his classification hearing, Doe filed a motion requesting permission for a documentary film crew to videotape the proceedings before the board. Doe stated in his motion that he was waiving any privacy rights that were being protected by the nonpublic nature of the proceedings. Relying on 803 Code Mass. Regs. § 1.21 (2002),[20] the hearing examiner denied the motion.

Doe renewed his motion on the first day of his classification hearing, and after considering arguments from counsel for both parties, the hearing examiner again denied it. He explained that

---

[18]The conditions of probation set forth in Doe's probation contract state that he "shall either pay the probation fee as determined by the Probation Department or pursue community services as ordered by the Court." The special conditions of his probation further provide: "The probation department will collect the probation supervision fee of $50.00 per month." In our view, this condition specifies how the probation supervision fee will be collected and does not constitute a judgment that Doe is required to pay a sum certain.

[19]In his complaint, Doe also sought declaratory and injunctive relief on the grounds that the increase in his probation fees violated the double jeopardy and equal protection clauses of the Federal and State Constitutions, and was a disproportionate assessment in violation of the State Constitution. Doe has not raised these arguments in his appellate brief, and we do not consider them. See *Haufler* v. *Zotos*, 446 Mass. 489, 499 n.25 (2006) (argument not pursued on appeal is waived); Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975) ("The appellate court need not pass upon questions or issues not argued in the brief").

[20]The duties of a hearing examiner include the duty to "receive and rule on all motions." 803 Code Mass. Regs. § 1.21(1)(f) (2002). The powers of a hearing examiner include the power to "limit attendance or assign seating or both at the hearing in consideration of security, space availability, privacy and confidentiality." *Id.* at § 1.21(2)(a) (2002).

allowing the motion would be in contravention of the clear directive set forth in 803 Code Mass. Regs. § 1.10(2) (2002) that hearings held by the board "shall not be open to the public." The hearing examiner stated that his ruling also was based on security concerns about the location of the hearing (the first day was held at the Suffolk County jail), the privacy rights of Doe's victims, the board's interests in preserving for appropriate law enforcement agencies the ability to disseminate information about sex offenders, and the potentially distracting effect of the presence of a film crew.

Doe contends in this appeal that the denial of his motion requesting permission for a film crew to videotape the board's proceedings violated his rights under the First Amendment to the United States Constitution and art. 16 of the Massachusetts Declaration of Rights.[21] He further asserts that his "due process right" was violated because his classification hearing was not open to the public. In Doe's view, the same considerations that govern public access to criminal and civil trials should apply to adjudicative administrative hearings, at least when requested by the person who is the subject of the hearing. We disagree.

In a criminal proceeding, "[t]he First Amendment implicitly grants the public, including the press, a right of access to court trials." *Commonwealth* v. *Cohen (No. 1)*, 456 Mass. 94, 106 (2010). See *Globe Newspaper Co.* v. *Superior Court*, 457 U.S. 596, 604-606 (1982). This right is based on the public's "definite and concrete interest in seeing that justice is swiftly and fairly administered," and it is distinct from a defendant's right to a public trial. *Commonwealth* v. *Horton*, 434 Mass. 823, 832-833 (2001), quoting *Gannett Co.* v. *DePasquale*, 443 U.S. 368, 383 (1979). See *Commonwealth* v. *Martin*, 417 Mass. 187, 192-193 & n.8 (1994). We have stated that "the criteria which have been established by the United States Supreme Court for judging claims arising under the First Amendment . . . are equally

---

[21]The First Amendment to the United States Constitution provides, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ." Article 16 of the Massachusetts Declaration of Rights, as amended by art. 27 of the Amendments to the Constitution, states: "The liberty of the press is essential to the security of freedom in a state: it ought not, therefore, to be restrained in this commonwealth. The right of free speech shall not be abridged."

appropriate to claims brought under cognate provisions of the Massachusetts Constitution." *Opinions of the Justices*, 387 Mass. 1201, 1202 (1982), quoting *Colo* v. *Treasurer & Receiver Gen.*, 378 Mass. 550, 558 (1979).

Notwithstanding the significant fact that Doe's classification hearing is not a criminal proceeding, cf. *Doe, Sex Offender Registry Bd. No. 151564* v. *Sex Offender Registry Bd.*, 456 Mass. 612, 618 (2010), we conclude that he has no standing to assert the First Amendment rights of the documentary film crew that wanted to videotape the proceedings before the board.[22] See *Commonwealth* v. *Adamides*, 37 Mass. App. Ct. 339, 341 (1994) ("No case has been called to our attention in support of the proposition that a criminal defendant has standing to raise the First Amendment rights of members of the press or the public excluded from his trial"). Cf. *Commonwealth* v. *Horton, supra* at 833. While the fact that the classification hearing was not open to the public may have infringed on the First Amendment rights of the documentary film crew, an issue we need not decide, there was no infringement on Doe's own First Amendment or art. 16 rights.

As a general proposition, we have long recognized that the public should have access to our *courts*. See *Cowley* v. *Pulsifer*, 137 Mass. 392, 394 (1884) ("It is desirable that the trial of causes should take place under the public eye, not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed"). The right to a public trial is expressly granted to a criminal defendant under the Sixth Amendment to the United

[22]There is no Federal constitutional right to broadcast, photograph, or electronically record any *judicial proceeding* or portion thereof. See *Boston Herald, Inc.* v. *Superior Court Dep't of the Trial Court*, 421 Mass. 502, 507 n.8 (1995). See also Fed. R. Crim. P. 53 (2006) (prohibiting court room photographing and broadcasting). In contrast, S.J.C. Rule 1:19, as amended, 430 Mass. 1329 (2000), provides that, subject to certain limitations, "[a] judge shall permit broadcasting, televising, electronic recording, or taking photographs of proceedings open to the public in the courtroom by the news media for news gathering purposes and dissemination of information to the public . . . ."

States Constitution.[23] See *Waller* v. *Georgia,* 467 U.S. 39, 46 (1984); *Commonwealth* v. *Cohen (No. 1), supra.* Although the Massachusetts Constitution has no corresponding provision, see *Commonwealth* v. *Marshall,* 356 Mass. 432, 434 (1969), the Sixth Amendment right is applicable to our courts under the Fourteenth Amendment to the United States Constitution, and we have always recognized "the right of a criminal defendant to be tried in an open court." *Commonwealth* v. *Stetson,* 384 Mass. 545, 549 (1981). Similarly, with regard to civil judicial proceedings, "free access to civil trials is well established under the common law." *Boston Herald, Inc.* v. *Superior Court Dep't of the Trial Court,* 421 Mass. 502, 507 n.7 (1995).

One of the problems with Doe's contention that his classification hearing should have been open to the public is that the hearing is not a criminal or civil trial such that he is entitled to a public presence. To the contrary, his classification hearing is an adjudicative administrative proceeding, and the board has expressly determined that such a hearing "shall not be open to the public."[24] 803 Code Mass. Regs. § 1.10(2). Cf. *WBZ-TV4* v. *Executive Office of Labor,* 414 Mass. 767, 768-770 (1993) (holding that Commissioner of Labor and Industries could conduct nonpublic hearings on company's application for license to operate employment agency, and recognizing no First Amendment right of public access to such proceedings). The board has a substantial interest in protecting the privacy of both a sex offender, particularly given that a final decision has not yet been made regarding the offender's classification (if any), and the

---

[23]The Sixth Amendment to the United States Constitution provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ."

[24]General Laws c. 6, § 178L (2), provides that a classification hearing will be conducted "according to the standard rules of adjudicatory procedure or *other rules which the board may promulgate* . . . to determine by a preponderance of evidence such sex offender's duty to register and final classification" (emphasis added). Pursuant to this statutory authority, the board promulgated comprehensive regulations that "shall govern all administrative hearings held by the Sex Offender Registry Board" and "shall supersede the Standard Rules of Adjudicatory Procedure." 803 Code Mass. Regs. § 1.01 (2004). Those regulations include the one stating that classification hearings "shall not be open to the public," 803 Code Mass. Regs. § 1.10(2) (2004), and are entitled to substantial deference. See *Poe* v. *Sex Offender Registry Bd.,* 456 Mass. 801, 809 (2010), and cases cited.

offender's victims. See *Poe* v. *Sex Offender Registry Bd.*, 456 Mass. 801, 813 (2010), quoting *Doe, Sex Offender Registry Bd. No. 972* v. *Sex Offender Registry Bd.*, 428 Mass. 90, 100 (1998) ("At stake in a classification hearing is the sex offender's 'constitutionally protected liberty and privacy interest in avoiding registration and public dissemination of registration information' "). See also G. L. c. 6, § 178I (on receipt of request for sex offender registry information, board shall not release information identifying victim by name, address, or relation to offender). This interest would be undermined by public access to a classification hearing. Although an individual sex offender, like Doe, may want to waive his own privacy interests, he cannot waive the privacy interests of others. We recognize that, in other contexts, privacy interests may be trumped by constitutional or common-law rights that guarantee public access to judicial proceedings, except in limited circumstances. See *Commonwealth* v. *Martin, supra* at 192-194 (discussing constitutional issues concerning exclusion of general public from court room during criminal trial involving sexual offenses where complainant is minor). However, this presumption of openness does not extend to administrative hearings before the board.

Doe has asserted, with little supporting authority, that he has a due process right to a public classification hearing. He does not. A fundamental requisite of procedural due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong* v. *Manzo*, 380 U.S. 545, 552 (1965). See *Paquette* v. *Commonwealth*, 440 Mass. 121, 131 (2003), cert. denied, 540 U.S. 1150 (2004). In the context of the present case, the right to due process entitles a sex offender to an individualized, evidentiary hearing before a hearing examiner prior to the assignment of a final classification level. See *Doe, Sex Offender Registry Bd. No. 3844* v. *Sex Offender Registry Bd.*, 447 Mass. 768, 776 (2006); *Doe, Sex Offender Registry Bd. No. 972* v. *Sex Offender Registry Bd., supra* at 98-99. Doe received such a hearing and was represented by counsel. See *Poe* v. *Sex Offender Registry Bd., supra* at 811 (sex offender entitled to effective assistance of counsel at classification hearing). Since the time that the regulations governing the scope of a classification hearing first were promulgated, such hearings

have not been open to the public. See 803 Code Mass. Regs. § 1.10(2) (2000). To the extent that Doe contends that the purportedly "secret" nature of his classification hearing somehow violated his due process rights, his claim is unavailing. A transcript of the proceedings before the hearing examiner was made, see 803 Code Mass. Regs. § 1.24(2) (2009), a record of documents offered in evidence was assembled, see 803 Code Mass. Regs. § 1.24(1) (2009), and the hearing examiner made detailed and extensive findings of fact and rulings of law, see 803 Code Mass. Regs. § 1.22(1) (2002). This administrative hearing certainly was not "secret." Moreover, Doe availed himself of the opportunity to seek judicial review of his final classification.[25] See G. L. c. 6, § 178M; 803 Code Mass. Regs. § 1.26 (2004). We conclude that denying the public access to a classification hearing does not infringe on a sex offender's due process rights.

6. *Classification procedures.* Doe contends that the classification scheme used by the board and applicable to all sex offenders, based on numerous "factors" set forth in 803 Code Mass. Regs. § 1.40,[26] violates his due process rights under both the Federal and State Constitutions, because predictions about future misconduct are frequently inaccurate and, consequently, result in erroneous classifications. In Doe's view, current scientific research has called into serious question the validity of the factors set forth in § 1.40 as a means for accurately assessing an offender's risk to reoffend. To the extent that these factors result in arbitrary classification decisions, he continues, the classification scheme does not protect against the risk of an erroneous

---

[25]Absent extraordinary circumstances, such a judicial proceeding would be open to the public. See *Kirk* v. *Commonwealth, ante* 67, 70-74 (2011).

[26]Pursuant to G. L. c. 6, § 178K (1), the board is authorized to "promulgate guidelines for determining the level of risk of reoffense and the degree of dangerousness posed to the public" by sex offenders. The statute sets forth, in detail, factors that the board must consider in assessing an offender's risk of reoffense and the degree of dangerousness. See G. L. c. 6, § 178K (1) (*a*)-(*l*). The board has incorporated these and other risk factors in its regulations. See 803 Code Mass. Regs. § 1.40(1)-(24) (2002). The regulations state that they are based on the "available literature" regarding the risk factors enumerated in the statute, and in many instances, they cite specific scientific studies supporting the use of individual risk factors. See *id.* In particular, they rely on the work of several leading researchers in the field of sex offender recidivism. See *id.* See also *Commonwealth* v. *Powell,* 450 Mass. 229, 238 (2007) (general acceptance of theory in relevant scientific community is indicative of reliability).

deprivation of liberty. Based on the allegations in his complaint, Doe appears to be raising a facial challenge to the classification scheme on the ground that it violates his substantive due process rights. See *Aime* v. *Commonwealth*, 414 Mass. 667, 673-675 (1993) (discussing differences between substantive and procedural due process). In essence, Doe's challenge is not to the board's interpretation or application of its regulations but, rather, to the constitutionality of the regulations themselves, which shall guide the hearing examiner in reaching a final classification decision. See 803 Code Mass. Regs. § 1.40.

An administrative agency created by the Legislature, such as the board, see St. 1996, c. 239, § 1, has only those powers, duties, and obligations expressly conferred on it by statute or reasonably necessary to carry out the purposes for which it was established. See *Massachusetts Fed'n of Teachers* v. *Board of Educ.*, 436 Mass. 763, 773 (2002); *Saccone* v. *State Ethics Comm'n*, 395 Mass. 326, 335 (1985). See also *Smith* v. *Sex Offender Registry Bd.*, 65 Mass. App. Ct. 803, 813 (2006) (board has "considerable leeway" in interpreting G. L. c. 6, § 178K, and related regulations). The power delegated by the Legislature to an agency does not include the inherent authority to decide whether a particular statute or regulation that the agency is charged with enforcing is constitutional. See *Duarte* v. *Commissioner of Revenue*, 451 Mass. 399, 413-414 (2008); *Telles* v. *Commissioner of Ins.*, 410 Mass. 560, 566 (1991) (Abrams, J., concurring). See also *Weinberger* v. *Salfi*, 422 U.S. 749, 765 (1975) (constitutionality of statutory requirement is beyond jurisdiction of administrative agency to determine). Accordingly, the board does not have the authority to determine the constitutionality of the regulations that it must employ to reach a final classification decision. See *School Comm. of Springfield* v. *Board of Educ.*, 362 Mass. 417, 431 (1972) (administrative agencies do not resolve conflicts that may arise between statutory and constitutional provisions); *Maher* v. *Justices of the Quincy Div. of the Dist. Court Dep't*, 67 Mass. App. Ct. 612, 619 (2006). Cf. *Selectmen of Framingham* v. *Civil Serv. Comm'n*, 366 Mass. 547, 554 (1974) (administrative agency can make initial determination as to constitutional validity of regulation where constitutional issue rooted in specific facts of case). "It is for the courts, not administra-

tive agencies, to decide the constitutionality of statutes [or regulations]." *Maher* v. *Justices of the Quincy Div. of the Dist. Court Dep't*, supra. See *Telles* v. *Commissioner of Ins.*, supra (Abrams, J., concurring); *School Comm. of Springfield* v. *Board of Educ.*, supra. See generally *Cacicio* v. *Secretary of Pub. Safety*, 422 Mass. 764 (1996) (upholding facial validity of electronic telephone monitoring regulations promulgated by Department of Correction).

A properly promulgated regulation "has the force of law . . . and must be accorded all the deference due to a statute." *Borden, Inc.* v. *Commissioner of Pub. Health*, 388 Mass. 707, 723, cert. denied sub nom. *Formaldehyde Inst., Inc.* v. *Frechette*, 464 U.S. 936 (1983). A party challenging the validity of a regulation must prove in a judicial proceeding "that the regulation is illegal, arbitrary, or capricious." *Id.* at 722. A challenge to the constitutionality of a regulation of general application is appropriately presented as an action for declaratory judgment. See G. L. c. 30A, § 7.[27] See also *Salisbury Nursing & Rehabilitation Ctr.* v. *Division of Admin. Law Appeals*, 448 Mass. 365, 371 (2007) (challenge to validity of regulations that govern Medicaid rate calculations for nursing homes properly brought as action for declaratory judgment); *Massachusetts State Pharm. Ass'n* v. *Rate Setting Comm'n*, 387 Mass. 122, 126-127 (1982) (where plaintiff raises substantive challenge to general regulation and asserts that regulation is illegal based on particular facts, lawfulness of regulation is to be determined on basis of factual record made in judicial proceeding). "The purpose of the Declaratory Judgment Act is to afford a plaintiff relief from uncertainty and insecurity with respect to rights, duties, status, and other legal relations." *Nelson* v. *Commissioner of Correction*, 390 Mass. 379, 388 (1983). Moreover, a party challenging

---

[27]General Laws c. 30A, § 7, provides: "Unless an exclusive mode of review is provided by law, judicial review of any regulation . . . may be had through an action for declaratory relief in the manner and to the extent provided under chapter two hundred and thirty-one A." An action for declaratory judgment "may be used in the superior court to enjoin and to obtain a determination of the legality of the administrative practices and procedures of any . . . state agency or official which practices or procedures are alleged to be in violation of the Constitution of the United States or of the constitution or laws of the commonwealth, . . . which violation has been consistently repeated." G. L. c. 231A, § 2.

the constitutionality of a regulation, rather than simply its interpretation, is not required to exhaust administrative remedies before bringing an action for declaratory relief, particularly where the agency does not have the authority to decide the constitutional question in the first instance. See *Liability Investigative Fund Effort, Inc.* v. *Medical Malpractice Joint Underwriting Ass'n of Mass.*, 409 Mass. 734, 747 (1991). See also *Kelleher* v. *Personnel Adm'r of the Dep't of Personnel Admin.*, 421 Mass. 382, 385 (1995) (plaintiff need not exhaust administrative remedies prior to seeking declaratory or injunctive relief where "the case presents a purely legal question of wide public significance").

Here, Doe should have filed an original action in the Superior Court, seeking a judicial declaration of the constitutionality of the classification scheme and, in particular, the factors employed by the board in evaluating sex offenders for risk of reoffense and degree of dangerousness posed to the public. By such action, Doe could have received a plenary hearing on the factual and legal bases for his grievance, and the board would have been afforded the opportunity to rebut his contentions. A challenge to the constitutionality of a general regulation cannot be resolved by requesting declaratory relief in an appeal from an administrative agency decision because judicial review is confined to the administrative record, see G. L. c. 30A, § 14 (5), which has been made based on the presumption that the classification scheme is constitutional. Put another way, a hearing examiner is obligated to apply the risk factors set forth in 803 Code Mass. Regs. § 1.40 irrespective of the examiner's opinion as to their constitutionality. In this case, the hearing examiner stated that he did not have the power to strike any of the board's regulations. He further stated that the testimony of Doe's expert witness, Dr. Schwartz, criticizing the risk factors set forth in § 1.40 did not rise to the level of rebutting the presumption of their validity.[28] We conclude that because the board did not have the authority to determine the constitutionality of its own regula-

---

[28]The hearing examiner acknowledged that there is considerable disagreement among members of the psychological community concerning how the risk assessment of sex offenders should be conducted as well as about the accuracy and validity of such efforts. Nonetheless, the examiner continued, he was required to assess the potential that Doe might reoffend *in connection*

tions and because Doe failed to file an original action for declaratory relief in the Superior Court, we are without jurisdiction to decide the constitutionality of the classification scheme.

This conclusion is not inconsistent with our recent decision in *Doe, Sex Offender Registry Bd. No. 151564* v. *Sex Offender Registry Bd.*, 456 Mass. 612 (2010). In that case, the plaintiff claimed that the board's regulations setting forth the risk factors used to classify sex offenders were invalid because they had not been updated since 2002. See *id.* at 619-621. There is no indication that the plaintiff was raising a constitutional challenge to the classification scheme, necessitating the filing of an original action for declaratory relief. See *id.* The plaintiff further claimed that the board's classification in his case was fatally flawed because the regulations do not include a risk factor pertaining to the age of the offender. See *id.* at 620. We concluded that where the plaintiff had presented evidence of numerous scientific and statistical studies concerning the effect of age on recidivism, the board erred in reaching a classification determination without having considered this evidence. See *id.* at 621. Given that the board is expressly authorized to consider "all relevant evidence" in assessing risk of reoffense and degree of dangerousness, see 803 Code Mass. Regs. § 1.38(4) (2004), the board's failure to consider Doe's age resulted in a classification that was arbitrary and capricious. See *Doe, Sex Offender Registry Bd. No. 151564* v. *Sex Offender Registry Bd., supra* at 622-623. Here, the focus of Doe's claim is not that the board failed to consider substantial evidence that was relevant to his classification, but that the entire classification scheme itself is unconstitutional. In Doe's case, remand to the board would not resolve the constitutional issue.

*with* the danger he posed to the community. The hearing examiner stated that the interests of public safety would not be furthered by waiting for more accurate or scientifically accepted methods of risk assessment, or by waiting for more universal acceptance of such tools within the psychological community. See *Jurek* v. *Texas*, 428 U.S. 262, 274-276 (1976) (prediction about future behavior, although difficult to make, is essential element of many decisions rendered throughout criminal justice system and is based on all possible relevant information about individual whose fate must be determined). Further, the hearing examiner stated that the board need not amend its regulations each time a new study contradicts its risk factors. See *Smith* v. *Sex Offender Registry Bd.*, 65 Mass. App. Ct. 803, 812 (2006) (board not required to cite to particular study or article in support of individual risk factor).

7. *Substantial evidence of classification.* Doe next contends that the decision of the board is not supported by substantial evidence. At his administrative hearing, Doe presented the expert testimony of Dr. Schwartz, a licensed clinical psychologist specializing in the assessment and treatment of sex offenders, who opined that the majority of the factors set forth in 803 Code Mass. Regs. § 1.40 are not predictive of the risk of reoffense based on current scientific research in the area of sex offender recidivism. As a consequence, Dr. Schwartz performed her own assessment of Doe without relying on the board's factors. She concluded that he was not suffering from any personality disorders or mental abnormalities, and that he posed a lower likelihood of reoffending — probably less than five per cent over the next five years — than the baseline level of recidivism. The hearing examiner nonetheless concluded that the board had met its burden of proving by a preponderance of the evidence that Doe presented a high risk to reoffend and posed a high degree of dangerousness such that he should be classified as a level three offender. Doe asserts that the board's decision is not supported by substantial evidence because the hearing examiner rejected the testimony of Dr. Schwartz. He points out that the board did not present any witnesses or introduce any evidence to contradict her testimony, and he claims that the hearing examiner did not make subsidiary findings of fact to explain why he gave Dr. Schwartz's testimony limited weight. In Doe's view, the hearing examiner was improperly acting as a silent expert witness for the board. We disagree.

When analyzing the validity of a decision by the board, a reviewing court "must determine whether the decision is supported by substantial evidence." *Doe, Sex Offender Registry Bd. No. 10216* v. *Sex Offender Registry Bd.*, 447 Mass. 779, 787 (2006). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1 (6). The burden is on the appealing party to demonstrate the invalidity of the board's decision. See *Fisch* v. *Board of Registration in Med.*, 437 Mass. 128, 131 (2002). In conducting our review of such decision, we "give due weight to the experience, technical competence, and specialized knowledge of the [board], as well as to the discretionary authority

conferred upon it." G. L. c. 30A, § 14 (7). See *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.*, 394 Mass. 671, 681 (1985). It is the province of the board, not this court, to weigh the credibility of the witnesses and to resolve any factual disputes. See *Embers of Salisbury, Inc.* v. *Alcoholic Beverages Control Comm'n*, 401 Mass. 526, 529 (1988). See also *Smith* v. *Sex Offender Registry Bd.*, 65 Mass. App. Ct. 803, 812-813 (2006) (hearing examiner has discretion to consider which regulatory factors are applicable and how much weight to give each factor based on evidence at hearing). We reverse or modify the board's decision only if we determine that the decision is unsupported by substantial evidence or is arbitrary or capricious, an abuse of discretion, or not in accordance with law. See G. L. c. 30A, § 14 (7) (*e*), (*g*). See also *Doe, Sex Offender Registry Bd. No. 10216* v. *Sex Offender Registry Bd.*, *supra.*

In reaching a final classification decision for Doe, the hearing examiner, in a 186-page decision (including appendix), thoroughly considered the factors relevant to risk of reoffense and degree of dangerousness set forth in G. L. c. 6, § 178K (1), and 803 Code Mass. Regs. § 1.40. See note 26, *supra.* The examiner found the presence of four of the six factors that the Legislature has designated as "indicative of a high risk of reoffense and degree of dangerousness posed to the public." G. L. c. 178K (1) (*a*) (i)-(vi). He further found that a number of additional risk factors included in the board's regulations were applicable to Doe.

First, by stipulation of the parties, the hearing examiner considered the reports of Drs. Quinones, Joss, and Berlin, which were prepared in connection with Doe's petition for examination and discharge from the treatment center pursuant to G. L. c. 123A, § 9. Dr. Quinones, a qualified examiner, concluded that Doe did not suffer from a personality disorder, but that he exhibited symptoms of a mental abnormality diagnosed as paraphilia, not otherwise specified.[29] She also opined that Doe was predisposed toward "the commission of criminal sexual

---

[29] "The essential features of a Paraphilia are recurrent, intense sexually arousing fantasies, sexual urges, or behaviors generally involving . . . children or other nonconsenting persons that occur over a period of at least 6 months." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 566 (4th ed. 2000).

acts to a degree that makes [him] a menace to the health and safety of other persons." G. L. c. 123A, § 1. See G. L. c. 6, § 178C (defining "[m]ental abnormality"). Dr. Joss, a qualified examiner, and Dr. Berlin, an expert retained by Doe, agreed with Dr. Quinones's conclusion that Doe did not have a personality disorder, but they both opined that he suffered from the mental abnormality of ephebophilia.[30] The hearing examiner found based on a preponderance of the evidence that Doe suffers from a mental abnormality. See G. L. c. 6, § 178K (1) (*a*) (i); 803 Code Mass. Regs. § 1.40(1). Second, after considering evidence regarding the nature and circumstances of Doe's sexual offenses, the hearing examiner found that Doe had engaged in repetitive and compulsive behavior with his four victims. See G. L. c. 6, § 178K (1) (*a*) (ii); 803 Code Mass. Regs. § 1.40(2). Third, given that Doe engaged in the sexual misconduct at issue when he was in his thirties and forties and his victims were fourteen and fifteen years old, the hearing examiner found that Doe was an adult offender whose victims were children. See G. L. c. 6, § 178K (1) (*a*) (iii); 803 Code Mass. Regs. § 1.40(3). Fourth, the hearing examiner found that Doe had been adjudicated a sexually dangerous person in 2004 and was committed to the treatment center, although the examiner gave this factor reduced weight in light of the fact that Doe was released from confinement in 2006 pursuant to G. L. c. 123A, § 9.[31] See G. L. c. 6, § 178K (1) (*a*) (v); 803 Code Mass. Regs. § 1.40(5).

The hearing examiner found that a number of additional risk factors included in the board's regulations were applicable to Doe and bore on the assessment of his risk to reoffend and degree of dangerousness. Doe had formed relationships with extrafamilial victims. See G. L. c. 6, § 178K (1) (*b*) (i); 803 Code Mass. Regs. § 1.40(7). He had been living in the

---

[30]Dr. Joss stated that ephebophilia is a type of paraphilia that involves "recurrent sexual urges toward or sexual acts with early adolescent males."

[31]The hearing examiner stated that in light of the differences in focus, standards of proof, and interests involved in a proceeding for civil commitment as a sexually dangerous person as compared to a proceeding for classification by the board, the fact that Doe was determined to no longer be a sexually dangerous person was not dispositive of his current risk to reoffend and degree of dangerousness. See 803 Code Mass. Regs. § 1.40(5). Cf. *Commonwealth* v. *Chapman*, 444 Mass. 15, 21-22 n.10 (2005).

community for less than five years. See 803 Code Mass. Regs. § 1.40(9)(a). At least one of Doe's sexual offenses occurred in the presence of a third individual. See 803 Code Mass. Regs. § 1.40(9)(c)(1). His victims were adolescent males. See 803 Code Mass. Regs. § 1.40(9)(c)(2). Doe committed multiple sexual acts on a single victim during a single offending episode. See 803 Code Mass. Regs. § 1.40(9)(c)(3). On occasion, he sexually abused at least one victim while the victim was asleep. See 803 Code Mass. Regs. § 1.40(9)(c)(4). Doe's sexual misconduct took place over the course of approximately ten years. See 803 Code Mass. Regs. § 1.40(9)(c)(8). He offended against more than two victims. See 803 Code Mass. Regs. § 1.40(9)(c)(9). Finally, the sex offenses committed by Doe were specifically included under G. L. c. 6, § 178C, as sex offenses involving children. See 803 Code Mass. Regs. § 1.40(9)(c)(12).

In addition to considering evidence that was indicative of a high risk to reoffend and a greater degree of dangerousness to the public, the hearing examiner took into account evidence that would mitigate Doe's risk to reoffend. Doe is subject to lifetime probation with numerous strict conditions. See G. L. c. 6, § 178K (1) (c); 803 Code Mass. Regs. § 1.40(10). He is participating in sex offender treatment, although the hearing examiner concluded that he had insufficient information regarding the nature of the treatment and Doe's progress therein to determine its effect on his risk to reoffend. See G. L. c. 6, § 178K (1) (c); 803 Code Mass. Regs. § 1.40(11). Doe is living in a positive and supportive environment. See G. L. c. 6, § 178K (1) (c); 803 Code Mass. Regs. § 1.40(12). He successfully adjusted to the rigors of incarceration. See G. L. c. 6, § 178K (1) (i); 803 Code Mass. Regs. § 1.40(19). Finally, Doe is motivated to remain out of prison so as to continue receiving high quality cancer treatment. See G. L. c. 6, § 178K (1) (d); 803 Code Mass. Regs. § 1.40(13).

During her expert testimony, Dr. Schwartz challenged the validity of the classification process, stating that the regulations did not accurately reflect current science and noting that, as to some factors, there was no recognized and reported relationship

between the factor and the risk to reoffend.[32] As such, Dr. Schwartz opined that many of the factors lacked predictive value. Consequently, she did not employ the board's factors in assessing Doe's risk to reoffend and degree of dangerousness, relying instead on other methods of evaluation, including the so-called Static-99 risk assessment tool.[33]

The hearing examiner found Dr. Schwartz's opinion only partially convincing. He stated that she was persuasive in determining that Doe's stringent terms of probation, current lifestyle, progress in sex offender treatment, and behavior while on community supervision all lowered his risk to reoffend. However, the hearing examiner stated that Dr. Schwartz appeared too dismissive of the board's factors and was too forgiving of Doe's unwillingness to acknowledge that he sexually abused four teenage boys. The examiner rejected Dr. Schwartz's minority opinion that Doe's ephebophilia was not a mental abnormality. Significantly, the hearing examiner stated that Dr. Schwartz's critique focused exclusively on the matter of recidivism risk assessment and ignored the fact that an offender's degree of dangerousness, as a function of the nature and scope of harm that could befall similarly situated victims if the offender were to reoffend, was the other component of the classification decision. The examiner stated that Dr. Schwartz's summary dismissal of certain of the board's regulations as unqualifiedly arbitrary (such as victim extravulnerability; relative level of

[32]Dr. Schwartz testified that, in forming her opinion that Doe posed a low risk to reoffend, she did consider whether Doe's sexual misconduct was repetitive and compulsive, whether his victims were under the age of sixteen, whether he was adjudicated a sexually dangerous person, the nature of his relationships with his victims, whether he used force or violence in the commission of his sexual offenses, the amount of time that he had been living in the community, whether his criminal history demonstrated a propensity for lawless behavior, and whether he had a history of alcohol or substance abuse.

[33]The Static-99 risk assessment tool is an actuarial instrument designed to estimate the probability of sexually violent recidivism among adult males who have been convicted of at least one sexual offense against either a child or a nonconsenting adult. It was developed to ascertain a general recidivism risk range based primarily on static (historical) factors, as its intended purpose is to render an assessment at the point of an offender's release from custody. The Static-99 method does not consider categories of potentially relevant variables (e.g., dynamic factors), and therefore, absent the commission of new offenses, an offender's score does not change over time.

physical contact; use of force; use of threats; number of victims; child victims; offenses in a public place; and victim impact), notwithstanding their clear relevance to the assessment of dangerousness, oversimplified the classification process. As a consequence, the examiner continued, Dr. Schwartz's disinclination to consider the full scope of analysis required under the regulations severely diminished the utility and reliability of both her opinion regarding Doe's appropriate classification based on his combined risk to reoffend and degree of dangerousness and her opinion as to the efficacy of the board's regulations. The hearing examiner rejected the notion that Dr. Schwartz's reliance on the Static-99 results and on Doe's self-reported dynamic risk factors predicted his present risk to reoffend and degree of dangerousness. The hearing examiner stated that the classification process did not require him to determine if Doe *ever* would reoffend but, rather, whether he posed a risk to do so and to weigh that risk in regard to the danger posed to public safety.

The opinion of a witness testifying on behalf of a sex offender need not be accepted by the hearing examiner even where the board does not present any contrary expert testimony. See *Doe, Sex Offender Registry Bd. No. 1211* v. *Sex Offender Registry Bd.*, 447 Mass. 750, 764 (2006) (hearing examiner need not accept conclusions of offender's expert where examiner finds presence of several risk factors, including two "high risk" factors); *Wyatt, petitioner*, 428 Mass. 347, 360 (1998) (law does not give expert opinion benefit of conclusiveness, even where no contrary opinions are introduced). See also M.S. Brodin & M. Avery, Massachusetts Evidence § 7.4.3, at 411-412 (8th ed. 2007). The board is not required to introduce expert testimony to support its position at a classification proceeding. See *Doe, Sex Offender Registry Bd. No. 10216* v. *Sex Offender Registry Bd.*, *supra* at 786. Here, the hearing examiner carefully considered and weighed all the evidence that was presented. He found that multiple statutory and regulatory factors indicated that Doe presented a high risk of reoffense and a high degree of dangerousness, and that evidence in mitigation was insufficient to lower these risks. Accordingly, the hearing examiner concluded that Doe should be classified as a level three offender. We conclude that this determination was supported by substantial evidence.

8. *Hearsay evidence presented at hearing.* Doe asserts that the hearing examiner, in classifying him as a level three offender, improperly relied on hearsay evidence that Doe *forcibly* raped M.L. and J.P. The various statements by M.L. and J.P., in the view of Doe, were riddled with inconsistencies and contradictions and, as such, did not provide the necessary indicia of reliability in order to be considered by the hearing examiner. Doe points out that he neither admitted to nor was convicted of forcible rape. Absent this hearsay evidence, he continues, there was no other substantial evidence to support his classification as a level three offender. We disagree.

A hearing examiner is not bound by the rules of evidence applicable to court proceedings. See G. L. c. 30A, § 11 (2); 803 Code Mass. Regs. 1.19(1) (2002). Instead, the examiner may admit and give probative effect to evidence "if it is the kind of evidence on which reasonable persons are accustomed to rely in the conduct of serious affairs." *Id.* See *Doe, Sex Offender Registry Bd. No. 10304* v. *Sex Offender Registry Bd.*, 70 Mass. App. Ct. 309, 312 (2007). In the context of administrative proceedings, hearsay evidence bearing indicia of reliability constitutes admissible and substantial evidence. See *Covell* v. *Department of Social Servs.*, 439 Mass. 766, 786 (2003); *Embers of Salisbury, Inc.* v. *Alcoholic Beverages Control Comm'n*, 401 Mass. 526, 530 (1988). It is the duty of the hearing examiner to assess the reliability of exhibits introduced in evidence and draw therefrom all reasonable inferences. See 803 Code Mass. Regs. § 1.21(1)(g) (2002).

The statements by M.L. and J.P. were submitted in evidence by the board as part of a collection of State police reports. As to M.L., there was one statement that he had written, and three statements written by other individuals recounting what M.L. had told them. The hearing examiner found that M.L.'s allegations that Doe forcibly raped him were sufficiently detailed as to render them reliable evidence under the preponderance of the evidence standard applicable to classification proceedings. See *Commonwealth* v. *Durling*, 407 Mass. 108, 121 (1990) (factual detail indicative of reliability of hearsay evidence admitted at probation revocation hearing). Moreover, the examiner stated that M.L.'s version of events was closely related in time, place,

and forms of acts to that alleged by another victim, showing a common course of conduct by Doe that was logically probative. See *Doe, Sex Offender Registry Bd. No. 10304* v. *Sex Offender Registry Bd., supra* at 313. To the extent that there were any inconsistencies among the statements made by M.L., it was the province of the hearing examiner to evaluate their reliability. See 803 Code Mass. Regs. § 1.21(1)(g).

As to J.P., there was one statement written by a State police sergeant in 1999 recounting that in 1990 J.P. had indicated to her that Doe "had not touched him." There was a second statement given by J.P. to a State trooper in 1998 in which J.P. described being sexually assaulted by Doe when J.P. was fourteen and fifteen years old. In his decision, the hearing examiner stated that J.P. did not speak with the State police about being "molested" by Doe until 1998 because, among other reasons, that was when J.P. learned that Doe was engaging in the same conduct with another boy. After considering the substance of the allegations made by M.L., the hearing examiner found by a preponderance of the evidence that J.P.'s statement to the police alleging forcible sexual assault by Doe was true. See *Commonwealth* v. *Durling, supra*; *Doe, Sex Offender Registry Bd. No. 10304* v. *Sex Offender Registry Bd., supra.*

We cannot conclude that the hearing examiner erred in crediting the statements of M.L. and J.P. and in determining that they bore sufficient indicia of reliability to constitute admissible evidence. Accordingly, the examiner could rely on such evidence in reaching a final classification decision for Doe. Even if we were to conclude that the hearing examiner improperly credited the statements of M.L. and J.P. regarding forcible rape, the administrative record indicates that the examiner did not rely primarily on this particular evidence in determining that Doe should be classified as a level three offender. As we have already discussed, there was substantial evidence to support Doe's classification, separate and apart from the statements of M.L. and J.P.

9. *Notice of issues at hearing.* Doe next asserts that the board failed to give him adequate notice of the factual and legal issues to be discussed at his administrative hearing. He acknowledges that the notice of the hearing included, and he received, all of

the materials that were considered by the board in making its initial recommendation as to Doe's classification (approximately 226 pages of documents). However, Doe contends that he had no meaningful opportunity to rebut the hearsay allegations of forcible rape made by M.L. and J.P. We conclude that Doe's claim lacks merit.

Pursuant to 803 Code Mass. Regs. § 1.09(1) (2004), the board was required to notify Doe of the "date, time and place of the hearing" not less than thirty calendar days prior to such date. Further, the board was required to provide Doe with "a copy of his file as compiled by the [b]oard" in making its recommendation. *Id.* The board satisfied both of these requirements, as acknowledged by Doe. We agree with the judge below that the board was not required to highlight each piece of evidence and every avenue of possible inquiry that the hearing examiner could pursue during the administrative proceeding. Doe was provided with the statements that had been made by M.L. and J.P. Given that his actions with respect to those two victims would have been a focus of the hearing, the entirety of their statements, which were each only several pages in length, should have been an area for careful consideration by Doe.

10. *Admission of treatment center records.* Following his adjudication as a sexually dangerous person, Doe was committed to the treatment center from July 19, 2004, until January 25, 2006. When he arrived there, he refused to sign an "Informed Consent for Treatment," which would have allowed the disclosure of treatment records and anything said during sessions with a therapist.[34] As pertinent here, prior to his classification hearing, Doe filed a motion to exclude "mental health records" generated during his stay at the treatment center, claiming, among other things, that they were privileged under G. L. c. 233, § 20B (psychotherapist-patient privilege), and G. L. c. 112, § 129A (psychologist-patient confidentiality). In particular, Doe sought to exclude (1) a July 12, 2005, report of the community access board (CAB), submitted by Dr. Michael Henry, in which the

---

[34]We note that, as one of his special conditions of probation, Doe agreed to "[p]rovide a release and waiver of patient/physician privilege or similar privilege to permit the probation department to discuss [his] course of evaluation and treatment, including review of all records prepared by any person providing treatment."

CAB determined that Doe remained a sexually dangerous person; (2) treatment reviews signed by Dr. Nicholas Petrou, clinical director of the treatment center, dated September 20, 2005, and December 13, 2005; and (3) various contact notes and clinical forms written by staff members relating to their interactions with Doe. The hearing examiner denied Doe's motion. Doe argues that the examiner erred in admitting and considering these records. We disagree.

The board's regulations state that "the rules of privilege recognized by law shall be observed" at classification hearings. 803 Code Mass. Regs. § 1.19(1) (2002). General Laws c. 233, § 20B, provides, in relevant part, that in "administrative proceedings, a patient shall have the privilege of refusing to disclose, and of preventing a witness from disclosing, *any communication,* wherever made, *between said patient and a psychotherapist relative to the diagnosis or treatment of the patient's mental or emotional condition*" (emphasis added). See *Three Juveniles* v. *Commonwealth,* 390 Mass. 357, 360-361 (1983) (recognizing testimonial privilege as to certain communications between psychotherapist and patient). A "[p]atient" is defined as "a person who, *during the course of diagnosis or treatment,* communicates with a psychotherapist" (emphasis added). G. L. c. 233, § 20B. See *Robinson* v. *Commonwealth,* 399 Mass. 131, 134 (1987) (describing who constitutes "patient" for purposes of privilege under G. L. c. 233, § 20B). Further, "[c]ommunications" are defined as including "conversations, correspondence, actions and occurrences relating to diagnosis or treatment before, during or after institutionalization . . . and any records, memoranda or notes of the foregoing." G. L. c. 233, § 20B.

Significantly, the hearing examiner found that during Doe's commitment to the treatment center, he refused to participate in sex offender treatment or to answer questions posed by evaluators during scheduled reviews. The primary reason for his refusal was that Doe objected to the fact that treatment was not confidential. Therefore, the challenged records from the treatment center did not constitute privileged communications between Doe and a psychotherapist pertaining to the diagnosis or treatment of a mental or emotional condition. However, our inquiry as to the admissibility of these records does not end there because

we must consider whether such records incorporated other information that may have been privileged and, if so, whether the hearing examiner erred in admitting them.

With respect to the July 12, 2005, report of the CAB, the hearing examiner found that because Doe refused to participate in the review process, the CAB relied on information presented in the March 30, 2004, report of Dr. William Hazelett, a qualified examiner, who evaluated Doe prior to his adjudication as a sexually dangerous person. See G. L. c. 123A, § 13 (*a*). The report of Dr. Hazelett was not admitted in evidence at Doe's classification hearing. We do not know whether Doe waived his privilege when he was evaluated and diagnosed by Dr. Hazelett. See *Johnstone, petitioner*, 453 Mass. 544, 552 (2009) (when interviewed by qualified examiners, petitioner may assert psychotherapist-patient privilege, but doing so precludes petitioner from offering opinion of own expert at trial); *Commonwealth* v. *Lamb*, 365 Mass. 265, 267-270 (1974) (construing G. L. c. 233, § 20B, as preserving patient's right to keep privileged any communications made to court-appointed psychotherapist during court-ordered examination, absent showing that patient was informed that communication would not be privileged and thus could be used at commitment hearing). See also G. L. c. 233, § 20B (*b*) (privilege not applicable to communications made after patient informed by psychotherapist that communications would not be privileged). Accordingly, it is possible that the "communications" between Doe and Dr. Hazelett that first were presented in Dr. Hazelett's report and then appeared in the CAB's July 12, 2005, report were privileged. However, we conclude that even if the hearing examiner erred in admitting the CAB's report, Doe has failed to show how this alleged error prejudiced his substantial rights. See G. L. c. 30A, § 14. See also *Grant* v. *Lewis/Boyle, Inc.*, 408 Mass. 269, 274 (1990) (improperly admitted evidence not ground for new trial unless error injured substantial rights of party); *Adoption of Saul*, 60 Mass. App. Ct. 546, 549 (2004). The hearing examiner stated that he accorded the CAB's report "little weight" because its opinions were based on a review of other source information and on an assumption not shared by other psychologists who had evaluated Doe that he suffered from a personality disorder.

The treatment reviews, contact notes, and clinical forms were comprised of observations made by staff members regarding Doe's adjustment to the facility, his behavior, his refusal to participate in treatment programs or periodic reviews, and on-going efforts by the staff to address these issues. Because Doe refused to participate in treatment, we conclude that these challenged documents were not records or notes of conversations between Doe and a psychotherapist pertaining to his diagnosis or treatment such that they would be considered privileged "communications" within the meaning of G. L. c. 233, § 20B. The mere fact that the treatment center kept records on Doe does not mean that those records necessarily were of a sort that would be deemed privileged from disclosure. Moreover, contrary to Doe's assertion, the fact that he chose not to participate in treatment is highly relevant because a psychotherapist-patient relationship forms the basis for the privilege under G. L. c. 233, § 20B. We add that even if the hearing examiner erred in admitting these particular documents, Doe has failed, once again, to show how this alleged error prejudiced his substantial rights. The examiner's decision does not indicate that he relied on, or even considered, the treatment reviews signed by Dr. Petrou in a reaching a determination on Doe's classification. Further, to the extent that the hearing examiner referred to the notes that were written by treatment center staff members, it was merely to describe Doe's behavior during his interactions with these individuals.

Finally, Doe contends that the challenged records were "confidential" under G. L. c. 112, § 129A, and, as such, should have been excluded from evidence by the hearing examiner. General Laws c. 112, § 129A, provides that "[a]ll communications between a licensed psychologist and the individuals with whom the psychologist engages in the practice of psychology are confidential," subject to certain specified limitations.[35] Further, "[n]o psychologist, colleague, agent or employee of any psychologist . . . shall disclose any information acquired or revealed in the course of or in connection with the performance

---

[35]Communications to a licensed psychologist that are confidential under G. L. c. 112, § 129A, are privileged from testimonial disclosure pursuant to G. L. c. 233, § 20B. See *Martin* v. *Commonwealth*, 451 Mass. 113, 116 n.6 (2008).

of the psychologist's professional services, including the fact, circumstances, findings or records of such services," except under enumerated conditions. *Id.* Given the hearing examiner's finding that Doe refused to participate in treatment (and, hence, could not have been the recipient of a psychologist's professional services), given our analysis of the nature of the challenged documents, and given our conclusion that Doe has not established that he was prejudiced by the admission of these documents, we conclude that Doe's claim under G. L. c. 112, § 129A, is unavailing.

11. *Conclusion.* We affirm the judgments of the Superior Court.

*So ordered.*